IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROGER DALE TERRY, JR.
(DOC 341-358),

    *Plaintiff,*

    v.

                          Civil Action No.: 11-cv-01686

DEPARTMENT OF PUBLIC
SAFETY & CORRECTIONAL
SERVICES et al.,

    *Defendants.*

**MEMORANDUM OPINION**

Plaintiff Roger Dale Terry Jr., an inmate currently incarcerated at the State of Maryland's Western Correctional Institution ("WCI"), filed suit under 42 U.S.C. § 1983 against Warden Bobby P. Shearin; Corrections Officers Sergeant Michael A. Middleton, Sergeant William P. Slate, and Patrick J. Shields; and Correctional Hearing Officer Fred Nastri, defendants.[1]  His Complaint arises from discipline imposed on him for what was eventually determined to be a false positive drug test of a substance confiscated from plaintiff at WCI.  Although all 200 of his good conduct credits were restored, plaintiff lost the right to 180 days of visitation, and served 189 days out of the 200 days of disciplinary segregation imposed upon him.  He alleges violations of the 8th Amendment and his rights under the 5th and 14th Amendments. He also asserts a host of complaints as to the disciplinary proceedings.

Defendants have moved to dismiss or, in the alternative, for summary judgment, pursuant to Rule 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure ("Motion," ECF 32).  They

---

[1] Initially, plaintiff also sued the Department of Public Safety & Correctional Services ("DPSCS"); Scott S. Oakley, Executive Director of the Inmate Grievance Office ("IGO"); Lenora C. Abegbeson, Administrative Officer of the IGO; and Corrections Officer Captain Jeffrey L. True.  He subsequently withdrew his claims against them. *See* ECF 39 at 2.

have also filed a memorandum in support of their Motion ("Memo," ECF 32-2).  Plaintiff

opposes the Motion ("Opposition," ECF 39),[2] and defendant has replied ("Reply," ECF 42).  The

parties have filed numerous exhibits with their submissions.  No hearing is necessary to resolve

the Motion.  *See* Local Rule 105.6.

## Factual Background[3]

On July 29, 2008, Sergeant Middleton, watching from a camera located in the United

Control Center at WCI, observed an unidentified inmate pass a small object to plaintiff.  *See*

defendants' Exh. 1, Admin. Record, at 000052, "Notice of Inmate Rule Violation and

Disciplinary Hearing" ("Notice").  Middleton stopped Terry, searched him, and found "a black

like tar substance wrapped in saran wrap."  *Id*.  Terry protested that the substance was merely

coffee.  However, Middleton stated under oath that, when he confiscated the substance from

plaintiff, "[i]t was known at that time [that] inmates were attempting to pass [Controlled

Dangerous Substances ('CDS')] concealed in coffee grinds at WCI...."  Defendants' Exh. 11,

Middleton Declaration, ¶ 3.  Middleton also averred that "coffee grinds would have no effects on

the outcome of [drug] test results."  *Id*.

Middleton took the item to "Operations" for drug testing by Officer Shields.  *See* Notice.

A chain of custody form was completed at that time.  *Id*.  After Officer Shields tested the

substance using a Narcotics Identification Kit ("NIK"), he determined that it tested positive for

---

[2] Plaintiff was self-represented when he filed suit, but is now represented by counsel. Apart from plaintiff's Opposition, which was submitted by counsel, plaintiff's other submissions were all submitted by plaintiff when he was *pro se*.

[3] The Court must construe the facts alleged in the light most favorable to plaintiff, as the non-moving party.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *accord Scott v. Harris*, 550 U.S. 372, 380 (2007).  However, the facts are largely undisputed.  *See* Opposition at 2 ("For the purposes of this discussion Plaintiff accepts the Statement of Facts set forth in Defendant's [sic] Memorandum.  He, however, disputes the inferences and conclusions to be drawn from those facts.").

amphetamine.  *Id.*; *see also id.* at 000039, "Western Correctional Institution Field Test Results Suspected CDS."

The NIK test is performed by putting the suspicious substance "in a clear plastic bag containing clear liquid and an ampoule of reagent."  Reply at Exh. 1, Shields Declaration, ¶ 2. When the substance is placed in the bag, the presence of "amphetamine-type compounds" is indicated by "[a]n orange color turning to brown."  *Id.*  Shields, who has been trained and certified to perform NIK field tests since 2006, averred that he "followed the NIK kit directions," and observed "the color of the NIK field test…first change[] to orange and then further change[] from orange to brown."  *Id.* ¶¶ 1-2.

Upon completion of the testing, the remaining substance was placed in WCI's "contraband locker" and the Internal Investigative Unit ("IIU") of the DPSCS was contacted so that "follow-up" testing could be completed by the State Police, to aid in the consideration of criminal charges against Terry.  *Id.* ¶ 1; Defendants' Exh. 11, Middleton Declaration, ¶ 3. Detective Sergeant Mark Forrest, the IIU employee "assigned to investigate Inmate Terry's possession of the substance in question with regard to possible criminal charges," took custody of the substance on September 4, 2008, placing it in the "DPSCS Drop Box for safekeeping." *See* defendants' Exh. 12, Forrest Declaration, ¶¶ 2, 4.  On October 2, 2008, he transmitted the substance to the Maryland State Police Crime Lab in Hagerstown, Maryland.  *Id.* ¶ 4.

As a result of the positive NIK test, plaintiff was charged with violations of Rule 112 ("Possession of CDS") and Rule 114 ("Possession of CDS – Distribute").  *See* Notice.  At the disciplinary hearing held on August 1, 2008, Terry pleaded not guilty and waived his rights to representation and to call witnesses.  *See* defendant's Exh. 1, Admin. Record, at 000030-31, "Inmate Hearing Record."   Sergeant Slate, acting as "Facility Representative," presented

Middleton's "violation report" and the results of the NIK test.  *Id.*  Slate also stated that Terry requested retesting of the sample.  *Id.* at 000031.  Terry claimed that he had coffee, "not meth," in his possession.  *Id.*  No other evidence was presented.  *Id.*

Relying on the credibility and reliability of the violation report and NIK test results, Correctional Hearing Officer Nastri found Terry guilty of both rule violations.  *Id.* at 000032. He found that "a preponderance of evidence was established to show that the substance confiscated did test positive for methamphetamine."  *Id.*  Nastri imposed a sanction of 200 segregation days, the loss of 200 good conduct credits, and, as is mandatory for a Rule 112 violation, "180 days loss of visits."  *Id.* at 000033.[4]

Plaintiff appealed the decision to Warden Shearin.  On August 27, 2008, Shearin affirmed both the decision and the sanctions.  *Id.* at 000028; 000035.  Terry then appealed to the IGO, *id.* at 000046-49, reiterating his desire to have the substance retested.  *Id.* at 000048.  On November 25, 2008, Administrative Officer Adegbeson dismissed the appeal, concluding that plaintiff did not "effectively…challenge the sufficiency of the evidence underlying the finding of guilt, or any interpretations of law, or compliance with procedural requirements or constitutional principles of due process, or the sanctions imposed...."  *Id.* at 000022.

---

[4] Forrest notes that if the substance was found to have been coffee, and not drugs, Terry could have been charged with violation of Rule 406, which prohibits "[p]ossessing, passing or receiving contraband," including "dietary food or condiment supplies," and could trigger "sanctions such as segregation and loss of visitation privileges."  *See* defendants' Exh. 12, Forrest Declaration, ¶ 7.

Terry had previously pleaded guilty on August 23, 2007, to violation of Rule 113, after he was discovered to have secreted two syringes behind his testicles, an offense for which he received 30 "seg days."  *See* defendants' Exh. 8, "Notices of Inmate Rule Violations," at 000007-08.  And, on September 17, 2007, Terry pleaded guilty to violations of Rule 104 and Rule 405, after threatening a guard: "Try to handcuff me and I will fuck up all you bitches."  *Id.* at 000015-17.  For these violations, Terry received, respectively, 150 and 60 "seg days," to be served concurrently.  *Id.*

On December 22, 2008, plaintiff appealed the IGO decision to the Circuit Court for Allegany County, Maryland.  *See* defendants' Exh. 3b, Oakley Declaration, ¶ 3.  Soon after, on January 19, 2009, the Maryland State Police Hagerstown Crime Lab completed an analysis of the substance seized from Terry, and determined that there was "No CDS Detected."  *See* ECF 18 at 3, "Request for Laboratory CDS Examination, Chain of Custody Log/Laboratory Report."

In light of that negative test result, on March 17, 2009, Paul O'Flaherty, Assistant Commissioner of the Division of Correction, reversed Terry's "disciplinary conviction" of August 1, 2008, and vacated the sanctions, instructing the Warden to restore plaintiff's 200 days of good conduct credits and expunge the conviction from his file.  *See* ECF 5 at 2-3, "Memorandum Re: Conviction Reversal and Expungement."  On April 20, 2009, Circuit Court Judge W. Timothy Finan dismissed plaintiff's case, without prejudice.  *See* defendants' Exh. 1, Admin. Record, at 000015, "Order."

This suit followed.  Plaintiff initiated the suit by filing a form complaint alleging a violation of 42 U.S.C. § 1983 on June 17, 2011.  *See* ECF 1.  He recounted the events described *supra*, alleging that his due process rights were violated and that the "189 seg days" he served before the reversal of March 17, 2009 caused him "emotional hardships and mental anguish" and constituted "cruel & unusual punishment," in violation of his Eighth and Fourteenth Amendment rights.  *Id*. at 4.  He also alleged negligence.  *Id*.  Terry demanded compensatory damages of "$75.00 a day for every day [he] spent wrongfully on lock-up," as well as "$150,000 dollars [sic] in punitive damages for knowingly & maliciously convicting [him]."  *Id*.[5]

---

[5] In the form complaint, plaintiff also alleged that his "property was destroyed" and that he "lost [his] job 95 [cents] a day sanitation" and his "right to earn good credits."  *Id*.  Terry submitted a request for administrative remedy ("ARP") with respect to these allegations on April 12, 2009.  *See* defendants' Exh. 4, "Maryland Division of Correction Request for Administrative Remedy."  On April 21, 2009, the "ARP Coordinator" dismissed the case, stating that

Thereafter, plaintiff filed a number of supplemental submissions expanding on his allegations in the form complaint. *See* ECF 5; ECF 8; ECF 18. These submissions comport with the factual record developed *supra*, and include a number of exhibits, several of which have been referenced here.

Plaintiff ultimately filed an amended complaint ("Amended Complaint," ECF 20), in which he reiterates the constitutional claims that defendants acted "knowingly & maliciously with ill intent & deliberate indifference" in violating plaintiff's Eighth Amendment right to be secure from cruel and unusual punishment, and his Fifth and Fourteenth Amendment rights of due process. *Id.* at 6 ¶ 40. He complains of "Negligence," "Deliberate[] Indifferen[ce]," "Denial of Due Process," "Atypical Hardships," and "Mental Anguish and Emotional Distress." *Id*.

In the Amended Complaint, plaintiff alleges that Shields was negligent and deliberately indifferent in performing a test on the alleged coffee when a brown color would denote a positive result, arguing: "What color would one think coffee would turn a clear solution?" *Id.* at 3 ¶ 18; 4 ¶ 23.[6]   Plaintiff also alleges that Middleton was deliberately indifferent in not accepting

---

"[a]dditional information is needed to investigate [the] request," and instructed Terry, by May 6, 2009, to submit a "copy of 'conviction reversal'" and a "copy of confiscation form with list of property sent home." *Id.* Terry did not provide the requested materials. *See* defendants' Exh. 5, Declaration of Sergeant Jeffrey Shimko, Administrative Remedy Procedure Coordinator, ¶ 2.

On June 22, 2009, Terry appealed to the Commissioner's Office, which dismissed the appeal on July 21, 2009, as untimely. *See* defendants' Exh. 6, Admin. Record at 000023. On September 10, 2009, Terry appealed to the IGO, *id.* at 000021, but the appeal was dismissed by Adegbeson on December 22, 2009, because Terry failed to submit the ARP by May 6, 2009, as he had been instructed to do. *Id.* at 000011.

Defendants dedicate a significant portion of their Memo to arguing that plaintiff's claims relating to the lost property, job, and opportunity to earn "good credits" are barred due to plaintiff's failure to exhaust. *See* Memo at 26-27. However, in his Opposition, at 8, plaintiff states that the point "is moot by virtue of the withdrawal of Mr. Terry's claim regarding the loss of his property and job."

[6] Plaintiff also claims in the Amended Complaint that the pictures of the July 29, 2008, NIK field test showed that the substance seized from him was not tested in a "NIK test bag"

plaintiff's representation that the disputed substance was coffee, not drugs.  *Id*. at 4 ¶ 23. Further, plaintiff alleges that Shearin was deliberately indifferent in denying his appeal, and in not retesting the substance in light of plaintiff's insistence that it was coffee.  *Id*. at 4 ¶ 24.

In addition, plaintiff contends that he was denied due process because he "specifically wrote on [his] ticket to have [Shields] (tester) to be present as a witness & also for the item to be" at the hearing on August 1, 2008, but "[n]either happened."  *Id*. at 5 ¶ 26.  He also claims he was never shown a copy of the test results, and was never asked if he wanted witnesses to appear on his behalf.  *Id*. at 5 ¶ 27.[7]  He insists that the denial of an immediate retest constituted a denial of due process, and that the evidence produced before Nastri was "not sufficient to find guilt." *Id*. at 5 ¶¶ 28-29.

Plaintiff alleges that he suffered "atypical hardships" due to losing his right to have visitors, access the library, and earn good conduct and "double celling" credits.  *Id.* at 5 ¶ 31.[8] He claims that his family stopped writing to him, abandoned him, and disowned him because he "had promised to stay out of trouble & drug free," and they "thought he broke that promise."  *Id.*

_____

appropriate for testing for amphetamines, but was rather labeled "Heroin, Codeine, Morphine (opiates)."  *Id*. at 3 ¶ 17.  He contends that Nastri was therefore negligent and grossly negligent in concluding that plaintiff was guilty of possessing amphetamine.  *Id*. at 3 ¶ 19 - 4 ¶ 22. However, in a subsequent filing on December 8, 2011, Terry referred to a color photograph of the NIK test taken on July 29, 2008, which indicated a positive test for amphetamine.  *See* ECF 26.  In the Opposition, filed after Terry retained counsel, Terry did not dispute that Shields documented a positive test result for amphetamine.

In plaintiff's many *pro se* submissions, he raised a number of immaterial factual disputes not described here that he believes are indicative of "foul play" or concealment.  Again, plaintiff's counsel has not pursued these allegations, and the core of operative facts described, *supra*, has been accepted as true.

[7] The record shows, as noted, that Terry waived his rights to representation and to call witnesses.  *See* defendants' Exh. 1, Admin. Record, at 000030, "Inmate Hearing Record."  Terry has not pointed to any evidence in the voluminous record supporting the contention that he requested the production of evidence or witnesses and was refused.

[8] As noted, *supra*, plaintiff also complained of being fired from his sanitation job and of the loss of his property.  *Id*. at 5 ¶¶ 32-33.  But, he has abandoned these claims.

at 5 ¶ 34-6 ¶ 35.  As a result, he asserts that he suffered mental anguish and emotional distress due to his family's abandonment and is "constantly SAD & stressed out."  *Id*. at 6 ¶¶ 36-38. Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages. *Id*. at 8-9.

## Standard of Review

As noted, defendants have moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), or, in the alternative, for summary judgment, pursuant to Fed. R. Civ. P. 56.  Ordinarily, summary judgment is inappropriate if "the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

Generally, in order to raise the issue that discovery is needed, the party opposing the motion must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)).  Failure to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate."  *Evans*, 80 F.3d at 961.  *But see Harrods Ltd.*, 302 F.3d at 244 ("[I]n some cases courts have held that summary judgment was premature even when the opposing party failed to file a [Rule 56(d)] affidavit.").  Here, the parties have not engaged in discovery. But, plaintiff has not filed a Rule 56(d) affidavit.  And, both sides have submitted exhibits in support of their positions.  Therefore, I will construe the Motion as one for summary judgment.

Under Rule 56(a), summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former Fed. R. Civ. P. 56(c)). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the entry of judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet this burden, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*; *see In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). Stated another way, "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing that there is a dispute of material facts. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24.

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In resolving the motion, the Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott, supra*, 550 U.S. at 378. The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict" for the non-moving party, there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

## Discussion

Defendants advance several arguments in support of their Motion.  They argue, *inter alia*, that plaintiff's constitutional claims must fail because the deprivations of which he complains (namely, assignment to segregated housing and denial of visitation) are not "atypical and significant hardship[s] on the inmate in relation to the ordinary incidents of prison life," so as to constitute protected liberty interests.  Memo at 17-19 (quoting *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995)).  And, defendants contend that plaintiff's due process claim is without merit because, in their view, plaintiff was afforded due process, and any possible denial of due process became moot when the finding of his infraction was reversed and his good conduct credits were restored.  Memo at 20-22.  Moreover, defendants argue that any state claims lodged by plaintiff should be dismissed because the defendants are entitled to immunity.  *Id.* at 22-25.[9]

Plaintiff counters that he was deprived of liberty interests.  Noting that "[v]isitation is a significant component of prison life," Opposition at 5, defendant argues: "While visitation may not be a 'right,' visitation is so ingrained in prison policy as to be tantamount to a right."  *Id.*  In his view, the segregation exposed plaintiff to "isolation, absence of any meaningful activity and lack of social and recreational activities."  *Id.* at 6.  Plaintiff also contends that he was denied due process, insisting that he "was not afforded a fair hearing and was convicted on the basis of false evidence."  *Id.* at 4.  Moreover, Terry believes the state claims are not subject to dismissal on the basis of immunity because he has alleged that defendants acted with malice.  *Id.* at 6.

---

[9] The Amended Complaint, filed when plaintiff was *pro se*, is not a model of clarity.  It appears that plaintiff is attempting to bring state law tort claims in addition to his constitutional claims, including negligence / gross negligence, and intentional or negligent infliction of emotional distress.  But, he does not articulate them clearly.  The Opposition, filed by plaintiff's counsel, does not clarify the state law tort claims plaintiff has attempted to bring.  *See* Opposition at 6.

*Constitutional Claims*

*A. Due Process*

"In order to prevail on either a procedural or substantive due process claim, inmates must first demonstrate that they were deprived of 'life, liberty, or property' by governmental action." *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997). Such a deprivation will only be found in the imposition of "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, *supra*, 515 U.S. at 484.

Plaintiff points to his exposure to "isolation, absence of any meaningful activity and lack of social and recreational activities," as a result of the disciplinary segregation, arguing that it constituted an atypical and significant hardship, and implicated a liberty interest. Opposition at 6. Plaintiff's experience was indeed unfortunate, but his complaints are intrinsic to disciplinary and administrative segregation.

Disciplinary segregation does not impose upon a prisoner an atypical or significant hardship triggering due process. In *Beverati*, *supra*, 120 F.3d at 503-04, the Fourth Circuit observed that "although the conditions [sustained by prisoners on administrative segregation] were more burdensome than those imposed on the general prison population, they were not so atypical that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life."

Nor am I persuaded by plaintiff's argument, made without citation to any authority, that "[w]hile visitation may not be a 'right,' visitation is so ingrained in prison policy as to be tantamount to a right." Opposition at 5. Restriction on visitation in connection with prison discipline does not implicate a liberty interest. *See Propps v. West Virginia Dep't of Corrections*, No. 98-7371, 1998 WL 808983, *1 (4th Cir. Nov. 23, 1998) ("[T]here is no

constitutional right to visitation.") (*citing Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61 (1989)); *Wright v. Vitale*, No. 91-7539, 1991 WL 127597, *1 (4th Cir. July 16, 1991) ("[V]isitation is a privilege and not a constitutional right") (*citing White v. Keller,* 438 F. Supp. 110 (D. Md. 1977), *aff'd,* 588 F.2d 913 (4th Cir. 1978)).

I am also satisfied that Terry was not deprived of due process.  In *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006), the Court said that, to succeed on a due process claim, a prisoner "must show that: he was denied a liberty interest protected by the Due Process Clause…; this denial imposed on him an 'atypical and significant hardship...in relation to the ordinary incidents of prison life'…; *and the process that the state prison employed was constitutionally inadequate*…." (citations omitted; emphasis added).

Inmates facing disciplinary proceedings are entitled to "advance written notice of the claimed violation, as well as a written statement concerning the evidence relied upon and the reasons for the disciplinary action taken," and have a "qualified right 'to call witnesses and present documentary evidence in [their] defense when permitting [them] to do so will not be unduly hazardous to institutional safety or correctional goals.'"  *Brown v. Braxton*, 373 F.3d 501, 504-05 (4th Cir. 2004) (quoting *Wolfe v. McDonnell*, 418 U.S. 539 (1974)).   Due process requires that "some evidence" support a prison disciplinary decision.  *See Superintendent v. Hill,* 472 U.S. 445, 455-56 (1985) (emphasis added) ("We hold that the requirements of due process are satisfied if *some evidence* supports the decision by the prison disciplinary board…the relevant question is whether there is *any evidence in the record* that could support the conclusion reached by the disciplinary board.").

It is undisputed that Terry received prior written notice of the alleged violations and a written decision.  In his Amended Complaint, at 5, Terry complains that he requested that a

witness, Shields, attend the hearing, and that his request went unheeded.  But, the record shows that Terry waived his right to call witnesses, although Shields was available to testify.  *See* defendants' Exh. 1, Admin. Record, at 000030, "Inmate Hearing Record."  Terry also alleges, Amended Complaint at 5, that he requested the production of tangible evidence, the substance at issue, but has not pointed to any evidence in the voluminous record supporting the contention that he requested the production of evidence and that his request was refused.  Terry insists that he was never shown a copy of the NIK test results, but that does not comport with the record, which clearly indicates that Slate presented a copy of the test results at the hearing.  *See* defendants' Exh. 1, Admin. Record, at 000031, "Inmate Hearing Record."  Plaintiff protests that he was denied a retest, but has not pointed to any provision that entitled him to one, or to any case law indicating that a retest must be provided upon demand as a prerequisite to satisfy due process.

Moreover, in an unreported case, a panel of the Fourth Circuit has held that a single positive drug test is sufficient evidence to support disciplinary action.  In *Thompson v. Hall*, No. 88-6525, 1989 WL 90668 (4th Cir. Aug. 14, 1989), the panel rejected the prisoners' argument that "the use of unconfirmed positive results…as the sole basis for imposing…punitive sanctions violates their right to procedural due process under the Fourteenth Amendment."  *Id.* at *1.  The Court noted that the test in question did not have "a 100% confidence factor," but reasoned that "other forms of evidence, such as eyewitness testimony, universally recognized as legally sufficient, cannot be said to be 100% reliable," and concluded that use of the test afforded prisoners "all the process due them under the Constitution and interpreting case law."  *Id.* at *2. *See also Higgs v. Bland*, 888 F.2d 443, 449 (6th Cir. 1989) (holding that, while "a test which produced frequent incorrect results could fail to constitute 'some evidence' under the *Hill*

standard," in the absence of evidence that "the probability of false results was more than a mathematical possibility," a positive urinalysis "constitutes 'some evidence' from which [a disciplinary] board could conclude that a tested inmate was guilty of the offense of drug use.").

Numerous federal courts of appeal have held that there is no generalized right to a retest in the wake of a disputed test result. *See, e.g., Easter v. Saffle*, 51 F. App'x 286, 289 (10th Cir. 2002) (as to an inmate who requested a retest because his asthma medication could cause a false positive result, concluding that a "*single* urinalysis amounts to 'some evidence' and thus satisfies due process") (emphasis in *Easter*); *Henson v. U.S. Bureau of Prisons*, 213 F.3d 897, 898-99 (5th Cir. 2000) ("Henson identified no specific need for the retest (either by showing that the test is unreliable or that it was improperly administered) or any case law supporting a general right to retest positive drug results.[]   Given that there was 'some evidence' supporting the punishment,[]…and that there would still be 'some evidence' even if Henson obtained a contradictory result from a retest, Henson had no due process right to retest the pipe."); *Koenig v. Vannelli*, 971 F.2d 422, 423 (9th Cir. 1992) (holding that a prison could deny a prisoner's request for a follow up drug test, as "accommodating the inmate's asserted right would create a 'ripple effect' among other prisoners, and impose a significant administrative burden on prison officials," and "not every inmate could afford independent tests.").

I decline to find that Terry's due process rights were violated because he was sanctioned on the basis of a flawed NIK field test, the results of which he disputed, and for which he was ultimately vindicated.  As noted, a single positive drug test is sufficient evidence to support disciplinary action. *See Thompson*, *supra*, 1989 WL 90668 at *1-2.  And, to find that prisons will run afoul of prisoners' due process rights if they deny retests to inmates who claim a false

positive test result would potentially "impose a significant administrative burden on prison officials." *Koenig, supra,* 971 F.2d at 423.

Plaintiff appears to argue, albeit in the context of qualified immunity, that his case is somehow different because the "brown color result [of the NIK test] was a foregone conclusion in light of the fact that the [tested] substance was in fact brown." Opposition at 8. Although the argument is attractive superficially, it does not withstand scrutiny, and cannot support a finding that plaintiff was entitled to a retest, or that the evidence was not sufficient to support Nastri's finding plaintiff culpable of violations of rules 112 and 114.

The substance was described as "black like tar," not brown. *See* Notice. And, Middleton has averred, under oath, that, even if the substance were coffee, as Terry claimed, "[i]t was known at that time [that] inmates were attempting to pass CDS concealed in coffee grinds at WCI, but coffee grinds would have no effects on the outcome of [drug] test results." Defendants' Exh. 11, Middleton Declaration, ¶ 3. Moreover, a positive NIK test result for amphetamine is not merely "brown," as plaintiff alleges, but rather "[a]n orange color turning to brown." Reply at Exh. 1, Shields Declaration, ¶ 2. As noted, Shields, who has been trained and certified to perform NIK field tests since 2006, averred that he "followed the NIK kit directions," and observed "the color of the NIK field test…*first change[] to orange* and then further change[] from orange to brown." *Id.* ¶¶ 1-2 (emphasis added). Again, it is unfortunate that the NIK field test resulted in a false positive. But, it does not follow that plaintiff's due process rights were violated.

"Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person." *Patterson v. New York*, 432 U.S. 197, 208 (1977). Terry was afforded all of the rights to which he was entitled, and the

disciplinary conviction was certainly based on "some evidence." Faced with a positive test result on which prison officials were entitled to rely, defendants were entitled to find the evidence sufficiently probative of guilt. In my view, no reasonable jury could find that plaintiff's due process rights were violated.

### B. Cruel and Unusual Punishment

"To demonstrate that conditions of confinement constitute cruel and unusual punishment, [an inmate] must (1) establish that prison officials acted with 'deliberate indifference' and (2) prove extreme deprivations of basic human needs or 'serious or significant' pain or injury." *Smith v. Ozmint,* 578 F.3d 246, 255 (4th Cir. 2009) (quoting *Williams v. Benjamin,* 77 F.3d 756, 761 (4th Cir. 1996)).

Examination of the Amended Complaint and plaintiff's other *pro se* submissions does not make readily apparent the basis of plaintiff's claim that he was subjected to cruel and unusual punishment, in violation of the Eighth Amendment. In his Opposition, at 3, plaintiff seems to argue that the delay in retesting "was calculated to insure that Mr. Terry had completed the majority of his sentence and, therefore, constituted a violation of his liberty interest and subjected him to cruel and unusual punishment." But, plaintiff was not entitled to a retest, so any delay in procuring such a test cannot be actionable. Moreover, plaintiff has not demonstrated that any delay was "calculated," rather the result of overburden or a simple mistake.[10]

The substance was transmitted by WCI to the State Police in October 2008, approximately two months after the incident. The substance was in the custody of the State Police for several months, pending further analysis, completed in mid-January 2009. But, there

---

[10] Defendants posit: "Given the need in a prison situation to segregate an inmate who has a history of concealing drug paraphernalia and has been witnessed receiving possible contraband in the prison yard, prison officials did not have the luxury to wait…for a perhaps overwhelmed State Police laboratory to process a testing request." Reply at 21.

is no claim that the State Police deliberately delayed the retesting, or were told to delay the retesting, or were motivated by ill will.  "[N]either '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that 'reasonable minds could differ' on a material point, then, regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law,' 'summary judgment, if appropriate, shall be entered.'" *Bouchat*, *supra*, 346 F.3d at 522 (citations omitted; alterations in *Bouchat*).  Put another way, "[t]he nonmoving party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.'  Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"  *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (citations omitted).

To the extent that plaintiff suggests that segregation from the prison population is cruel and unusual punishment, his claim is without support in the law.  *See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471-72 (4th Cir. 1999) (indefinite administrative segregation not cruel and unusual punishment).  *See also Westbrook v. Bazzle*, No. 08–3926, 2010 WL 844594, *5 (D.S.C. Mar. 4, 2010) ("[Plaintiff] has not alleged that the punishment itself was cruel and unusual, only that the wrongful conviction caused him to be punished when he should not have been.  Since the court grants Defendants' motion for summary judgment as to Plaintiff's due process claims, it does not need to address any alleged damages associated with that claim.").  No reasonable jury could find that plaintiff's Eighth Amendment right to freedom from cruel and unusual punishment was violated on the basis of his segregation.

*State Claims*

Defendants are also entitled to summary judgment as to any state law tort claims brought by plaintiff, because they are entitled to statutory immunity.

Under the Maryland Tort Claims Act ("MTCA"), state employees are immune from liability "for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence." Md. Code (2006 Repl. Vol., 2011 Supp.), § 5–522(b) of the Courts & Judicial Proceedings Article. For purposes of MTCA immunity, "malice" refers to "actual malice," *i.e.* "conduct 'characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Lee v. Cline,* 384 Md. 245, 268, 863 A.3d 297, 311 (2004). *See also Shoemaker v. Smith,* 353 Md. 143, 164, 725 A.2d 549, 560 (1999) (actual malice is conduct "motivated by ill will, by an improper motive, or by an affirmative intent to injure"). And, in *Foor v. Juvenile Services*, 78 Md. App. 151, 170, 552 A.2d 947, 956, *cert. denied*, 316 Md. 364, 558 A.2d 1206 (1989), the Maryland Court of Special Appeals described gross negligence, as follows:

> Gross negligence has been equated with "wilful and wanton misconduct," a "wanton or reckless disregard for human life or for the rights of others." *White v. King,* 244 Md. 348, 223 A.2d 763 (1966). In *Romanesk v. Rose,* 248 Md. 420, 423, 237 A.2d 12 (1968), the Court, quoting from 4 Blashfield, *Cyclopedia of Automobile Law and Practice* § 2771 (1946), held that "a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *See also Liscombe v. Potomac Edison Co.,* 303 Md. 619, 495 A.2d 838 (1985).

In my view, no reasonable jury could find that defendants acted with gross negligence or malice, so as to defeat statutory immunity under the MTCA. Although Terry alleged that defendants acted "knowingly & maliciously with ill intent & deliberate indifference," Amended Complaint at 6, and that defendants were negligent and grossly negligent in relying on the NIK

field test results, *id.* at 3, there is no evidence in the record that any of the defendants knew that they were relying on a false positive result in disciplining Terry, or that there was any unusual likelihood of a false positive in the use of the NIK test. Nor has Terry offered evidence, or even alleged, that any of the defendants intended to harm him. As discussed, Middleton averred under oath that he believed that, even if the substance were coffee, as Terry claimed, "coffee grinds would have no effects on the outcome of [drug] test results." Defendants' Exh. 11, Middleton Declaration, ¶ 3. And Shields, who is certified to perform NIK field tests, averred that he "followed the NIK kit directions," and observed "the color of the NIK field test…first change[] to orange and then further change[] from orange to brown." Reply at Exh. 1, Shields Declaration, ¶¶ 1-2.

Comparison to cases finding malice sufficient to defeat MTCA immunity demonstrates the insufficiency of plaintiff's allegations. *See, e.g., Barbre v. Pope,* 402 Md. 157, 186, 935 A.2d 699, 716 (2007) (plaintiff sufficiently alleged malice where officer shot him in the neck while his hands were raised in surrender); *Okwa v. Harper,* 360 Md. 161, 182, 757 A.2d 118, 129 (2000) (plaintiff sufficiently alleged malice where arresting officers "beat [plaintiff] about his head and neck while they twisted his thumbs"); *Sawyer v. Humphries,* 322 Md. 247, 261, 587 A.3d 467, 474 (1991) (plaintiff sufficiently alleged malice where officer, unprovoked and without cause, threw a rock at plaintiff's vehicle, wrestled him to the ground, grabbed him by the hair, and repeatedly hit his face, saying that he was "going to kill" plaintiff).

Conduct far more egregious than relying on an erroneous field test result is necessary to support a finding of gross negligence. *See, e.g., Foor, supra,* 78 Md. App. 151, 552 A.2d 947 (declining to find gross negligence when a foster child who abused drugs was placed with a family that had specified that "the only condition they had for participation in the [foster care]

program was that no child with a drug problem, past or present, should be placed in their home,"

and, while under the influence of drugs, the foster child murdered the family's biological child);

*Wells v. State*, 100 Md. App. 693, 642 A.2d 879 (not gross negligence when state actors took no

action to protect children despite repeated reports that their mother and her boyfriend subjected

them to horrific abuse, and one of the children ultimately died as a result of her injuries), *cert.*

*denied,* 336 Md. 560, 649 A.2d 602 (1994).

Moreover, in his Opposition, plaintiff does not argue that he adequately alleged malice or

gross negligence, or that there is any evidence in the record from which a reasonable jury could

find that defendants acted with malice or gross negligence. His attorney asserted, *id.* at 6-7:

> Needless to say Mr. Terry is limited in his ability to draft a complaint that
> conforms precisely to the technical requirements for pleading a claim. It is
> submitted that his allegation s [sic] were sufficient to give notice of the nature of
> his claim….In the event that the Court determined [sic] that Mr. Terry's pleadings
> are deficient, he requests the opportunity to file an amended complaint to address
> any deficiency that the Court may perceive.

The mere allegations of malice and gross negligence, contained in the Amended

Complaint, are insufficient to state a claim under Rule 12(b)(6). Nor does the record suggest that

it could support such a claim.

In sum, the undisputed facts establish that plaintiff was in possession of a suspicious

substance that tested positive for illegal drugs. An administrative hearing was held and, in light

of the positive test results, a hearing officer found plaintiff guilty of rule violations. After a

period of delay, during which plaintiff had unfortunately already borne the brunt of his

punishment, it became apparent that the test results on which defendants had reasonably relied

were in fact flawed. There is simply no evidence of malice or gross negligence in connection

with these facts.

Plaintiff has already filed an Amended Complaint, and has been represented by counsel since December 14, 2011 (*see* ECF 30).   Moreover, plaintiff has not argued that discovery is necessary to help him develop or prove his claims.   "[A] nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"   *Phelan, supra*, 526 F.3d at 140 (citations omitted).   Because there is no evidence of malice or gross negligence by the defendants, and no issue of material fact has been generated, leave to amend is not warranted.

**Conclusion**

For the foregoing reasons, the Court will grant defendants' motion for summary judgment (ECF 32).  A separate Order, consistent with this Opinion, follows.


Date:  June 29, 2012                           /s/_____
                                               Ellen Lipton Hollander
                                               United States District Judge